*Jacoby & Meyers v. The Presiding Justices*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

————

August Term, 2016

(Argued: August 19, 2016     Decided:  March 24, 2017)

Docket No. 15-2608

————

JACOBY & MEYERS, LLP, ON BEHALF OF ITSELF AND ALL OTHER SIMILARLY SITUATED ENTITIES AUTHORIZED TO PRACTICE LAW IN THE STATE OF NEW YORK; JACOBY & MEYERS USA II, PLLC,

*Plaintiffs-Appellants*,

—v.—

THE PRESIDING JUSTICES OF THE FIRST, SECOND, THIRD AND FOURTH DEPARTMENTS, APPELLATE DIVISION OF THE SUPREME COURT OF THE STATE OF NEW YORK; ERIC T. SCHNEIDERMAN; DIANE MAXWELL KEARSE, IN HER OFFICIAL CAPACITY AS CHIEF COUNSEL FOR THE GRIEVANCE COMMITTEE FOR THE SECOND, ELEVENTH AND THIRTEENTH JUDICIAL DISTRICTS; GARY L. CASELLA, IN HIS OFFICIAL CAPACITY AS CHIEF COUNSEL FOR THE GRIEVANCE COMMITTEE FOR THE NINTH JUDICIAL DISTRICT; GREGORY A. GREEN, IN HIS OFFICIAL CAPACITY AS CHIEF COUNSEL FOR THE GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT; GREGORY J. HUETHER, IN HIS OFFICIAL CAPACITY AS CHIEF COUNSEL FOR THE GRIEVANCE COMMITTEE FOR THE FIFTH, SEVENTH AND EIGHTH JUDICIAL DISTRICTS; PETER M. TORNCELLO, IN HIS OFFICIAL CAPACITY AS CHIEF ATTORNEY FOR THE COMMITTEE ON PROFESSIONAL STANDARDS FOR THE APPELLATE DIVISION OF THE SUPREME COURT, THIRD JUDICIAL DEPARTMENT; MONICA DUFFY,

*Defendants-Appellees.*[*]

————

[*] The Clerk of Court is directed to amend the official caption in this case to conform to the caption above.

B e f o r e :

LYNCH and CARNEY, *Circuit Judges*, and HELLERSTEIN, *District Judge*.**

Plaintiffs-Appellants Jacoby & Meyers, LLP, a limited liability law partnership, and Jacoby & Meyers USA II, PLLC, a related professional limited liability company (together, "plaintiffs" or "the J&M Firms"), challenge the constitutionality of a collection of New York regulations and laws that together prevent for-profit law firms from accepting capital investment from non-lawyers. The J&M Firms allege that, if they were allowed to accept outside investment, they would be able to—and would—improve their infrastructure and efficiency and as a result reduce their fees and serve more clients, including clients who might otherwise be unable to afford their services. By impeding them from reaching this goal, the J&M Firms contend, the state has unconstitutionally infringed their rights *as lawyers* to associate with clients and to access the courts—rights that are grounded, they argue, in the First Amendment. The District Court (Kaplan, *J.*) dismissed the complaint, concluding that the J&M Firms failed to state a claim for violation of any constitutional right and that, even if such rights as they claim were to be recognized, the challenged regulations withstand scrutiny because they are rationally related to a legitimate state interest. We agree that under prevailing law the J&M Firms do not enjoy a First Amendment right to association or petition as representatives of their clients' interests; and that, even if they do allege some plausible entitlement, the challenged regulations do not impermissibly infringe upon any such rights. We therefore AFFIRM the District Court's judgment.

AFFIRMED.

DOUGLAS GREGORY BLANKINSHIP, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, White Plains, New York, *for Appellants*.

---

** Judge Alvin K. Hellerstein, of the United States District Court for the Southern District of New York, sitting by designation.

ANDREW RHYS DAVIES, Assistant Solicitor General (Barbara
D. Underwood, Solicitor General, Steven C. Wu,
Deputy Solicitor General, *on the brief*), *for* Eric T.
Schneiderman, Attorney General of the State of New
York, New York, New York, *for Appellees*.

SUSAN L. CARNEY, *Circuit Judge*:

Through a set of prohibitions of long standing in New York and similar to those widely prevalent in the fifty states and the District of Columbia, the State of New York prohibits non-attorneys from investing in law firms. *See generally* N.Y. State Bar Ass'n, *Report of the Task Force on Nonlawyer Ownership*, *reprinted at* 76 Alb. L. Rev. 865 (2013) ("*NYSBA Report*"). The prohibition is generally seen as helping to ensure the independence and ethical conduct of lawyers. *See id.* at 876-77. Plaintiffs-Appellants Jacoby & Meyers, LLP, a limited liability partnership (the "LLP"), and Jacoby & Meyers USA II, PLLC, a related professional limited liability company (the "PLLC"; together, "plaintiffs" or the "J&M Firms") bring a putative class action challenging New York's rules, regulations, and statutes prohibiting such investments. The infusions of additional capital that the regulations now prevent, they declare, would enable the J&M Firms to improve the quality of the legal services that they offer and at the same time to reduce their fees, expanding their ability to serve needy clients. They assert that, were they able to do so, they would act on that ability in the interests of such potential clients. Because the laws currently restrict their ability to accomplish those goals, they maintain,

3

the state regime unlawfully interferes with their rights *as lawyers* to associate with clients and to access the courts—rights they see as grounded in the First Amendment.

The United States District Court for the Southern District of New York (Kaplan, *Judge*) dismissed the complaint for failure to allege the infringement of any cognizable constitutional right. On *de novo* review, we identify no error in that conclusion. Neither as a for-profit law partnership nor as a professional limited liability company do the J&M Firms have the associational or petition rights that they claim. Even were we to assume, given the evolving nature of commercial speech protections, that they possess some such First Amendment interests, the regulations at issue here are adequately supported by state interests and have too little effect on the attorney-client relationship to be viewed as imposing an unlawful burden on the J&M Firms' constitutional interests. We therefore AFFIRM the judgment of the District Court.

## BACKGROUND

We draw this factual statement from the J&M Firms' Third Amended Complaint ("TAC"), accepting as true the allegations stated there for purposes of our review of the District Court's decision. *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 697 n.1 (2d Cir. 2015).

Founded in 1972, Jacoby & Meyers, LLP, is a New York-based law partnership that "maintains a network of affiliated law offices across the country, including in

4

Southern California, New York, Alabama, Florida, and Arizona." Joint Appendix ("J.A.") 106-07. The LLP presents as its mission the following: "[T]o ensure that people of modest or average means, who could often not afford to hire a lawyer, ha[ve] a practical alternative to obtain competent, qualified counsel at reasonable rates." J.A. 106. The LLP was formed and is operated, still, as a for-profit law firm, as is its co-plaintiff, the related professional limited liability company Jacoby & Meyers USA II, PLLC.[1]

The J&M Firms challenge the constitutionality of New York Rule of Professional Conduct 5.4, "Professional Independence of a Lawyer," and a clutch of New York state laws that in combination work to prevent non-lawyers from investing in New York law firms.[2] Rule 5.4, for example, provides in part that "[a] lawyer shall not practice with or

---

[1] Before filing this suit, Jacoby & Meyers, LLP, created Jacoby & Meyers USA, LLC (the "LLC"), its initial co-plaintiff. *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 118 F. Supp. 3d 554, 561 (S.D.N.Y. 2015). The LLC was a limited liability company that the LLP saw as a vehicle compatible with managing the desired outside investment. The LLP envisioned transferring its assets to the LLC, should it be permitted to accept such investments. Operating as a law firm, however, the LLC would have run afoul of certain New York laws that bar the practice of law by LLCs regardless of the nature of their investors. *See id.* at 563 (citing N.Y. LLC Law § 201 and N.Y. Judiciary Law § 495, which prohibit limited liability companies from practicing law). During the course of these proceedings, the LLC was replaced as co-plaintiff by Jacoby & Meyers USA II, PLLC. The format of the professional limited liability company permits both outside investment (if otherwise legal) and the practice of law. *See* N.Y. LLC Law §§ 1201 *et seq.* (governing PLLCs).

[2] The J&M Firms cite New York Judiciary Law §§ 478, 484, 485, 491, 495; New York Partnership Law § 121-1500(a)(I); and New York Limited Liability Company Law §§ 201, 1201, 1203, 1207(a), 1209, 1210, 1211, as effecting the prohibition. The American Bar Association, which includes an equivalent to Rule 5.4 in its Model Rules of Professional Conduct, has considered whether to

in the form of an entity authorized to practice law for profit if: (1) a non lawyer owns any interest therein . . . or (3) a non lawyer has the right to direct or control the professional judgment of a lawyer." N.Y. R. Prof'l Conduct 5.4(d).[3] Approaching the issue from a slightly different angle, New York Judiciary Law Section 491, for example, makes it a misdemeanor for any non-attorney to share fees or compensation with an attorney in consideration of client referrals.

The LLP alleges that it "wishes to expand its operations, hire additional attorneys and staff, acquire new technology, and improve its physical offices and infrastructure to increase its ability to serve its existing clients and to attract and retain new clients and qualified attorneys." J.A 107. To make these improvements, the LLP asserts, it requires capital contributions. It reports receiving "numerous offers" from "prospective non-lawyer investors . . . who are prepared to invest capital in exchange for owning an interest in the firm." J.A. 109. These include some "high net-worth individuals" and

---

support "alternative business structures"—including some that might permit non-lawyer investment—but has remained agnostic on the overarching issue, concluding simply that it warrants further exploration. *See* Am. Bar Ass'n R. Prof'l Conduct 5.4; Am. Bar Ass'n, Comm'n on the Future of Legal Servs., *Report on the Future of Legal Srvs. in the U.S.* 42-43 (2016). As the New York State Bar Association has noted, the functional effect of enacting these rules in one jurisdiction is that any lawyer practicing in multiple jurisdictions is bound by the most restrictive set of rules. *See NYSBA Report*, 76 Alb. L. Rev. at 900.

[3] New York's Rules of Professional Conduct, modeled after the ABA's Model Rules of Professional Conduct, were adopted by the Appellate Division of the New York State Supreme Court in 2009. *NYSBA Report*, 76 Alb. L. Rev. at 885. They are published as Part 1200 of the Joint Rules of the Appellate Division. *See* 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 1200 (2017).

"institutional investors" identified in the TAC. J.A. 109. And it would accept such contributions through the vehicle of the professional limited liability company that it has formed for this purpose. But in light of New York's prohibitions, it has "been relegated to obtaining capital from (i) the personal contributions of the partners, (ii) retained earnings on fees generated and collected, and (iii) commercial bank loans, which invariably come with onerous interest rates and intrusive covenants and conditions." J.A. 109. Moreover, these potential alternative sources of capital are either not available in practice, or too costly to be used.

In 2011, the LLP sued the Presiding Justices of the New York Supreme Court's Appellate Divisions (who administer Rule 5.4) and others, asserting that the rule violates the First and Fourteenth Amendments and the Dormant Commerce Clause of the U.S. Constitution. After an amendment of the complaint, a dismissal for lack of standing, and a successful appeal to this Court with respect to standing, the case was remanded to the District Court, at which point the J&M Firms filed a second amended complaint that attempted to articulate a constitutional challenge to the entire New York regulatory regime. *See Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 847 F. Supp. 2d 590, 591 (S.D.N.Y. 2012) ("*Jacoby I*"); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 488 F. App'x 526, 528 (2d Cir. 2012) ("*Jacoby II*"); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second,*

*Third & Fourth Dep'ts*, 118 F. Supp. 3d 554, 563 (S.D.N.Y. 2015) ("*Jacoby III*").[4] But on remand they met with no greater success: the District Court again granted the state's motion to dismiss, this time holding that the J&M Firms' amended complaint failed to state a claim for a violation of any constitutional right. *See Jacoby III*, 118 F. Supp. 3d at 566-81.

This appeal followed.

## DISCUSSION

We review *de novo* a district court's decision to dismiss a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016).

On appeal, the J&M Firms abandon many of the constitutional challenges asserted in their prior complaints, and press only the argument that New York's prohibition of non-lawyer investment in law firms infringes their First Amendment

---

[4] The District Court initially dismissed the complaint for lack of standing because the LLP challenged the constitutionality of only Rule 5.4—not any of the other provisions of New York law that address non-lawyer investment. *See Jacoby I*, 847 F. Supp. 2d at 591. On appeal, this Court vacated that judgment and remanded the case, directing the District Court to grant the LLP leave to amend its complaint in order to add the other relevant New York laws and regulations. *See Jacoby II*, 488 F. App'x at 527-28. It became clear at oral argument in *Jacoby II* that the LLP's failure to include those provisions arose from to its fear that the District Court would abstain, pursuant to *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), from deciding the case. Defendants, however, had become judicially estopped from making a *Pullman* abstention argument to the District Court in view of the position they took in their arguments to this Court, *see Jacoby II*, 488 F. App'x at 527, and the case proceeded accordingly.

rights to petition and to association.[5] The J&M Firms are not clear about whether their claim is a facial or as-applied constitutional challenge. The District Court observed that they "attempt[] to characterize [their] lawsuit as an as-applied challenge, [but] [they] simply do[] not appreciate the distinction between as-applied and facial challenges." *Jacoby III*, 118 F. Supp. 3d at 566 n.50. On appeal, they do not address the issue until their reply brief. In any event, "[b]ecause plaintiffs pursue this pre-enforcement appeal before they have been charged with any violation of law, it constitutes a facial, rather than as-applied challenge." *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted). "[T]o succeed on a facial challenge, the challenger must establish *that no set of circumstances* exists under which the [regulation] would be valid." *Id.* (internal quotation marks omitted). "As a result, a facial challenge to a legislative enactment is the most difficult challenge to mount successfully." *Id.* (internal quotation marks omitted).

We agree with the District Court that the J&M Firms' facial challenge fails: as a for-profit law partnership and professional limited liability company, the J&M Firms do not possess the First Amendment rights that they claim to have—and, even if they did

---

[5] In their papers on appeal, the J&M Firms also refer to the Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), in an attempt to link the freedom to operate in a particular corporate form with First Amendment protections for speech. They do not allege any suppression of speech, however, and so that case has little relevance to the issue at hand.

have some colorable claim to such rights, their complaint does not plausibly allege that the New York regulatory regime unlawfully restricts them.

### A. The First Amendment Rights to Petition and Association

The First Amendment prohibits the enactment of any law "abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Petition Clause has deep roots in the Anglo-American legal tradition. British subjects enjoyed the right to petition the monarch, and colonial Americans had the right to petition both the British government and local legislative assemblies. *McDonald v. Smith*, 472 U.S. 479, 482 (1985); James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. Rev. 899, 929-34 (1997). Many state constitutions included the right to petition the legislature even before such a federal right was recognized in the new country's Constitution. Pfander, 91 Nw. U. L. Rev. at 934-35. Not much detail about the Petition Clause appears, however, in the records of the constitutional debates. *See* Pfander, 91 Nw. U. L. Rev. at 954-55.

The right to associate freely is not mentioned in the text of the First Amendment, but has been derived over time as implicit in and supportive of the rights identified in that amendment. Thus, drawing upon the rights of both petition and expression, the Supreme Court has held that the First Amendment bears on some situations in which

10

clients and attorneys seek each other out to pursue litigation. One line of cases involving political advocacy organizations relies on the expressive value of certain types of associational litigation. In *NAACP v. Button* for example, the Court held that the NAACP's work on anti-segregation cases—and the organization's efforts to recruit plaintiffs for those cases—constituted "modes of expression and association protected by the First and Fourteenth Amendments." 371 U.S. 415, 428-29 (1963). Similarly, in *In re Primus*, the Court held that an ACLU attorney's solicitation of a potential client was protected by the First Amendment because "[t]he ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." 436 U.S. 412, 431 (1978).

Another line of Supreme Court authority recognizes that clients seeking legal representation—specifically in the context of union activity—have a right protected by the First Amendment to associate with each other to obtain legal representation and vindicate their rights effectively. *See, e.g., Bhd. of R.R. Trainmen v. Va. ex rel. Va. State Bar*, 377 U.S. 1, 5 (1964) ("*Trainmen*"). In this vein, the Court has held that "the First Amendment's guarantees of free speech, petition, and assembly give railroad workers the right to cooperate" to seek legal counsel, and that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585

(1971). This right has attached to the activities of workers who associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in their exercise of associational rights. *See United Transp. Union*, 401 U.S. at 582 ("[T]he members of a union have a First Amendment right to help and advise each other in securing effective legal representation . . . ."); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 225 (1967) ("The decree at issue here thus substantially impairs the associational rights *of the Mine Workers* . . . ." (emphasis added)); *Trainmen*, 377 U.S. at 8 ("[T]he Constitution protects the associational rights *of the members of the union* . . . ." (emphasis added)).

The *Button* line of cases might casually be characterized as reflecting lawyers' expressive rights in the causes they pursue—when those causes implicate expressive values—whereas in the union cases, it is the associational rights of the union members, as clients, that are the focus. The Supreme Court has never held, however, that attorneys have their *own* First Amendment right as attorneys to associate with current or potential clients, or their *own* right to petition the government for the redress of their clients' grievances when the lawyers are acting as advocates for others, and not advocating for their own cause. Although in *Trainmen*, the Court commented that "lawyers accepting employment under [the unions'] constitutionally protected plan [to recommend specific lawyers] have a like protection which the State cannot abridge,"

12

377 U.S. at 8, at most, the comment is dictum. It suggests only that attorneys may not be censured or sanctioned for taking on representation through a union referral program. We think that the comment may not properly be read as recognizing an advocate's own First Amendment right to associate with prospective clients or to petition the government through access to the courts.

In fact, the Court has explicitly distinguished between the First Amendment protections enjoyed by attorneys who, as part of an advocacy group like the ACLU or the NAACP, have recognized associational rights, and attorneys who are engaged in litigation for their own commercial rewards, albeit in the context of advancing or protecting the interests of their clients. In particular, in 1978 the Court issued on a single day decisions in two cases involving state regulation of attorneys, highlighting this distinction. In *In re Primus*, the Court struck down the South Carolina Supreme Court's sanction of an ACLU attorney for solicitation of clients, holding that the disciplinary ruling infringed her First Amendment rights. 436 U.S. at 427-28. In a decision issued in tandem with *Primus*, *Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (1978), however, the Court upheld Ohio's restriction on a private attorney's solicitation of potential personal injury clients. Distinguishing the pursuit of expressive activity from the pursuit of commercial interests, the Court wrote:

> Normally the purpose or motive of the speaker is not central to First Amendment protection, but it does bear on the

13

distinction between conduct that is an associational act of expression, and other activity subject to plenary regulation by government. *Button* recognized that certain forms of cooperative, organizational activity, including litigation, are part of the freedom to engage in association for the advancement of beliefs and ideas, and that this freedom is an implicit guarantee of the First Amendment. As shown above, [the *Primus*] appellant's speech—as part of associational activity—was expression intended to advance beliefs and ideas. In *Ohralik*, the lawyer was not engaged in associational activity for the advancement of beliefs and ideas; his purpose was the advancement of his own commercial interests. The line, based in part on the motive of the speaker and the character of the expressive activity, will not always be easy to draw, but that is no reason for avoiding the undertaking.

*In re Primus*, 436 U.S. at 438 n.32 (internal quotation marks and citations omitted).

We embraced that distinction in *Board of Education of the City of New York v. Nyquist*, where we rejected the argument that any attorney has a First Amendment right to litigate on behalf of a client even when the representation might violate ethical rules. 590 F.2d 1241, 1245 (2d Cir. 1979). Because the attorney in *Nyquist* was not, as was the lawyer in *In re Primus*, "encouraging the airing in court of a point of view she believed in," we concluded that the individual lawyer held no related First Amendment right to represent the clients in a case not raising other First Amendment concerns. *Nyquist*, 590 F.2d at 1245-46 (citing *In re Primus*, 436 U.S. at 422).

14

## B. The J&M Firms' Purported First Amendment Rights

These cases illustrate why the J&M Firms have failed to allege facts sufficient to establish that any First Amendment right held by them is infringed by the New York regulations, especially in light of the demanding standard that governs a facial constitutional challenge. The J&M Firms argue that the rights at issue are the lawyers' "right of access to the courts" and "right to associate with clients for purposes of accessing the courts." Appellants' Br. 20. But we think *In re Primus*, *Ohralik*, and *Nyquist* foreclose recognizing any such rights in a for-profit law partnership or PLLC that is not itself engaged in its own political advocacy or expression. *See In re Primus*, 436 U.S. at 438 n.32; *Ohralik*, 436 U.S. at 458; *Nyquist*, 590 F.2d at 1245. Clients have First Amendment expressive rights for which litigation may provide a vehicle. When the lawyers' own expressive interests align with those rights, the lawyers themselves may have a cognizable First Amendment interest in pursuing the litigation. We are not aware of any judicial recognition of such an interest, however, when it comes to the lawyer's generic act of pursuing litigation on behalf of any client.

The J&M Firms' lead argument to the contrary rests primarily on what we think is a misreading of the Supreme Court's union cases. In particular, they cite *United Transportation Union* and *United Mine Workers*, which we describe above, for the proposition that "lawyers hold First Amendment rights of access to courts." Appellants'

15

Br. 11, 15. But those cases do not so hold. Rather, they uniformly decide that unions and union members have rights under the First Amendment to associate and to act collectively to pursue legal action—action that ordinarily necessitates the involvement of lawyers. They do not establish that an *attorney* is entitled to access the court on a client's behalf, at least not under the First Amendment rights to petition or association. Our reading of these two cases, focusing on the expressive rights of clients, not their counsel, is in keeping, moreover, with the constitutional text: the rights of petition and assembly attach to "the people"—who are *themselves* aggrieved and accordingly who seek to assemble or to petition in order to redress their own grievances. U.S. Const. amend. I. Lawyers in a for-profit practice who act in their representative capacities do not themselves seek access to the courts to remediate their own grievances; rather, they are doing so as a part of a commercial transaction in which they serve, and are paid.[6]

The J&M Firms' error is compounded by their apparent assumption that they enjoy a constitutionally protected right to associate with clients *qua* clients. But the so-called "freedom of association" protected by the First Amendment has been generally understood to encompass two quite different types of associational activity: "choices to enter into and maintain certain intimate human relationships," and "associat[ion] for

---

[6] This is not to suggest, of course, that a litigant's right to present his or her position through counsel may easily be curtailed; it is to highlight, rather, that the right in question is the *client's*, not the lawyer's.

16

the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617, 618 (1984). The J&M Firms do not purport to invoke the former. And if their associations with clients merit protection as a version of the latter form of constitutionally-protected association, it must be that they offer a means to serve other First Amendment ends, not that the association is itself a protected First Amendment activity. *See Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005) ("The [Supreme] Court has tended to view the right of association as dependent on underlying individual rights of expression; there is no right of association in the abstract." (internal quotation marks and alteration omitted)). In other words, because the J&M Firms have not asserted that their clients' underlying suits implicate First Amendment concerns, we are aware of no constitutional protection for associating to bring those suits. *See Nyquist*, 590 F.2d at 1245.

The J&M Firms fault the District Court for relying on a distinction drawn in case law between the rights and interests of private, for-profit attorneys and not-for-profit political advocacy organizations. They contend that "the right of access to courts is not limited to instances in which attorneys provide services in cases with a political or constitutional dimension," and that Supreme Court precedent holds "that a for-profit attorney employed by an individual client to litigate a non-political grievance (such as a

17

personal injury case) is fully protected by the First Amendment *right of access to the courts*." Appellants' Br. 17. Although these assertions may hold some superficial appeal, again, we think they misconstrue precedent. As noted above, the Supreme Court has taken pains to differentiate between the protections that the Constitution affords the activities of lawyers acting in a for-profit setting and those acting in a not-for-profit context, advocating political causes in which the attorneys themselves share; those cases reference the attorneys' own associational and petition rights only in limited circumstances. *See In re Primus*, 436 U.S. at 438 n.32; *see also Ohralik*, 436 U.S. at 459 n.16 (observing that, in *Trainmen*, "the Court highlighted the difference between permissible regulation of lawyers and regulation that impinges on the associational rights of union members. . . . The Court implicitly approved of the State's regulation of conduct characterized colloquially as 'ambulance chasing.'").

Neither Jacoby & Meyers, LLP, nor Jacoby & Meyers USA II, PLLC, is a not-for-profit political advocacy organization engaging in its own expression, nor a collection of individuals seeking redress of their own grievances or vindication of their own rights. Instead, the J&M Firms are engaged in the practice of law as a business. Thus, their firms can be regulated as businesses, and, as will be explained below, those regulations do not automatically trigger strict scrutiny simply because one of the law firm's functions is to help clients access the courts. Of course, we do not question the right to

18

petition a court, with the aid of a lawyer, for redress. But in the context of for-profit law firms that serve their clients' interests as a business, that right belongs to the client, not the attorney. As in a comparable case in the Third Circuit, "[a]ppellants provide no support for the proposition that the Petition Clause protects the rights of an *attorney* [operating in the context of a for-profit law firm] to appeal to courts or other forums on behalf of another." *Nat'l Ass'n for the Advancement of Multijurisdictional Practice v. Castille*, 799 F.3d 216, 224 (3d Cir. 2015). Indeed, as the Supreme Court has observed, a "lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls squarely within the State's proper sphere of economic and professional regulation." *Ohralik*, 436 U.S. at 459. The J&M Firms also perceive their challenge as encompassing both present and potential clients' Petition Clause rights. To the extent that they may bring such claims on behalf of their clients, we reject that challenge on the merits for the reasons explained below.[7] But in the

---

[7] Without fully developing an argument for third-party standing, the J&M Firms at times appear to suggest that their claims encompass the rights of present and potential clients. Because we reject the J&M Firms' challenge to the relevant regulations on the merits, we need not decide today in what circumstances the third-party standing doctrine might permit attorneys in the capacity of plaintiffs to assert constitutional rights belonging to their clients. (We may avoid this question because limitations on third-party standing are prudential, not constitutional. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).) In general, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (internal quotation marks omitted). A plaintiff may bring a claim on behalf of a third party, only if he can establish: "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (internal quotation marks omitted). The Supreme Court has also

context of for-profit law firms who serve their clients' interests as a business, that right belongs to the client, not the attorney. The plaintiff firms have accordingly failed to state a claim that the New York regulations violate their First Amendment rights.

## C. The Failure to Allege any Burden on First Amendment Rights

Because the law is evolving rapidly with respect to the protections afforded commercial speech by the First Amendment, however, we proceed one step further with our analysis. We turn to addressing whether, to the extent that the J&M Firms could be found to have some degree of First Amendment right to associate with clients or to petition the government through the courts on their clients' behalf—or could be allowed to challenge the regulations on behalf of their clients—their complaint states a claim. We conclude again, however, that their claims fail because the regulations are supported by substantial government interests and impose an insubstantial burden on the exercise of any such First Amendment rights.

The heart of the causal argument is:

> [The] complaint alleges that several specifically identified
> non-lawyers stand ready to take equity stakes in [the J&M
> Firms'] law practice; that such equity will enable [the J&M

allowed plaintiffs to assert third-party standing where the "enforcement of the challenged restrictions *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130. The Court has stated that an existing attorney-client relationship is "of course, quite distinct from [a] *hypothetical* attorney-client relationship" for purposes of third-party standing. *Id.* at 131. We do not decide on which, if any, clients' behalf the J&M Firms might have asserted their constitutional challenge because the regulations at issue here do not violate the First Amendment.

20

Firms] to undertake several specific improvements in technology and infrastructure; and that those improvements, by increasing the efficiency of [the J&M Firms'] provision of legal services, will raise even higher the quality of their legal services and lower the cost to clients, thus affecting [] the scope, cost, and quality of lawyers' association with clients for purposes of accessing courts.

Appellants' Br. 28.

Taking these projections as accurate, and assuming that the J&M Firms would in fact serve more clients at a lower cost, New York's regulations proscribing non-lawyer investment in law firms do not impede the lawyers' constitutionally-shielded ability to associate or petition. We think the only plausible argument that the J&M Firms *could* have in this vein is that they would be able to and would in fact associate with and serve more needy clients if the regulations are lifted.[8] Any law firm, of course, might like to attract more clients, and any client would like to pay less for his lawyer's services. But these observations do not mean that regulations that hypothetically and marginally raise the cost of legal services infringe any lawyer's First Amendment right of association or access to the courts: the connection is simply too attenuated. Indeed, "the broadly formulated First Amendment argument here would, if successful, undermine the power of states to regulate bar membership" and numerous fundamental aspects of the legal profession, "when this power has been repeatedly

[8] The J&M Firms' assertions about quality of representation strike us as speculative and, in any event, irrelevant, since any right to access the courts would certainly not also involve a right to a lawyer of a certain caliber above ordinary competence.

21

recognized and upheld by courts." *Russell v. Hug*, 275 F.3d 812, 822 (9th Cir. 2002). Many of the rules governing lawyers, such as educational requirements, directly or indirectly affect the cost of legal services. There is no basis for subjecting legislative judgments that balance increased cost against consumer protection to strict judicial scrutiny simply because the business being regulated is the practice of law.

Like our sister circuits that have rejected similar Petition Clause challenges to ordinary regulations of the legal profession, we see a marked difference between the regulations at issue here and the state prohibitions on attorney activities that were struck down in *Button*, *Trainmen*, and *Primus*. Unlike in those cases, no attorney here risks censure or sanction for soliciting, meeting with, or representing a client—the activities that can be central to initiating and maintaining the attorney-client relationship. Here, by contrast, the regulations prohibiting non-lawyer investment in law firms simply do "not deny [lawyers] meaningful access to the courts." *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1048 (9th Cir. 2014) (rejecting a challenge to Arizona's admission-on-motion rule); *see Castille*, 799 F.3d at 221 (attorney admission reciprocity rule did not violate the Petition Clause, as it was a permissible "exercise of Pennsylvania's broad power to establish standards for licensing practitioners and regulating the practice of professions" (internal quotation marks omitted)). Like bar admission requirements, the regulations at issue here balance

22

desired limitations on the legal profession that promote quality and ethical lawyering against the necessary increase in the cost of practicing law. Such an increased cost does not implicate the First Amendment, especially where, as here, the law firms in question operate as for-profit businesses.

The J&M Firms attempt to analogize this case to *United Transportation Union*, and argue that if the right of access to the courts "is impermissibly burdened by prohibitions on such mundane activities as transporting clients to attorneys' offices," as the Supreme Court found there, then "the same right is surely burdened by impediments to the various specific efficiency-enhancing, price-reducing investments in law-firm infrastructure that, according to [the J&M Firms'] allegations, are obstructed by the challenged statutes and rules." Appellants' Br. 11. Their analogy fails to persuade us. The union in *United Transportation Union* had in fact been enjoined from, among other conduct, receiving any kind of compensation or reimbursement for the time or money spent in putting its members or their families in contact with recommended attorneys— and transporting its members from Michigan to Chicago, where the attorneys were located. *United Transp. Union*, 401 U.S. at 582. The Supreme Court struck down the injunction, including the portion related to travel: "Since the members of a union have a First Amendment right to help and advise each other in securing effective legal representation, there can be no doubt that transportation of injured members to an

attorney's office is within the scope of that protected activity. To the extent that the injunction prohibits this practice, it is invalid . . . ." *Id.* at 582-83. A court injunction that works to prevent clients from meeting with chosen attorneys at all strikes us as a far cry from state regulations that may at most work slightly, and in conjunction with a host of other factors, to increase the cost of legal services. *United Transportation Union* provides no reason to abandon our earlier conclusion that the challenged New York laws do not threaten any First Amendment right of the J&M Firms.

**D.	The State's Interest in the Challenged Regulations**

Because we hold that the J&M Firms' complaint does not plausibly allege the infringement of any First Amendment right, we need not stay long with the question whether New York's interests as a state justify its regulations regarding non-lawyer investments.

The J&M Firms ask us to apply strict scrutiny to the regulations. In the context of claims asserting First Amendment associational rights we have instructed that, depending on the burden that the statute imposes on those rights, we will "apply either strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest, or rational basis review, in which case the restriction need only be rationally related to a legitimate government interest." *Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007) (citations omitted). Strict scrutiny applies

24

only when a challenged regulation imposes "severe burdens" on associational rights. *Id.* As discussed above, however, no First Amendment right of the J&M Firms is even implicated by the challenged regulations, much less substantially burdened by them.

Accordingly, rational basis review applies. The regulations at issue plainly survive that standard because they are rationally related to a legitimate government interest. As the District Court noted, and as we think is cognizable even on a motion to dismiss, the challenged laws serve New York State's well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession. *See, e.g.*, *Jacoby III*, 118 F. Supp. 3d at 574-75; *Ohralik*, 436 U.S. at 460-61. For example, by proscribing the involvement of unrelated third parties in the attorney-client relationship, the regulations preclude the creation of incentives for attorneys to violate ethical norms, such as those requiring attorneys to put their clients' interests foremost. *See, e.g.*, *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1385-86 (7th Cir. 1992). They therefore easily pass muster under rational basis review.

**CONCLUSION**

The J&M Firms have no claim to the First Amendment rights of association and petition that the Supreme Court has recognized in political advocacy groups or in individuals seeking the vindication of their own rights through not-for-profit counsel. And the New York regulations at issue here have at most an attenuated effect on the

25

availability of attorney services to the population at large. Because the J&M Firms have neither plausibly alleged that they possess any First Amendment rights implicated here nor that any First Amendment right they might generously be assumed to have has been infringed, they have failed to state a claim for relief.

We **AFFIRM** the judgment of the District Court.